UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

J‌ERMOND P‌ERRY,

          Plaintiff,                  Case No. 1:20-cv-694

v.                                          Honorable Janet T. Neff

U‌NKNOWN K‌NAPP et al.,

          Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.    Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan. The events about which he complains occurred at that facility.

Plaintiff sues MCF Sergeant and Security Threat Group (STG) Coordinator Unknown Knapp. An STG is defined under MDOC Policy as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as an entity, pose a threat to staff or other prisoners or to the custody, safety and security of the facility." Mich. Dep't of Corr. Policy Directive (PD) 04.04.113(B) (eff. Feb. 26, 2015). The policy provides for a Correctional Facilities Administration (CFA) manager who coordinates STG tracking and monitoring for the entire MDOC; in addition, the warden of each facility appoints a local STG coordinator for the institution. PD 04.04.113(H-I).

A prisoner may be designated an STG I by the local STG Coordinator if there is sufficient documentation of the prisoner's membership in the STG and the prisoner fails to make a credible renunciation of his membership. PD 04.04.113(S). The CFA STG manager makes the final determination on designating a prisoner as an STG member. PD 04.04.113(T). A prisoner may be designated an "STG II" member if: (1) he is an STG I member and is found guilty of major misconduct related to his STG activity, (2) was previously an STG I member, and currently presents a threat to prisoners or staff, or (3) is identified as a leader, enforcer, or recruiter in an STG. PD 04.04.113(W).

A prisoner designated as an STG I member must be housed in security level II or higher. STG I prisoners are also subject to the following restrictions: prisoners are generally limited to three visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; cell search at least once a week. PD

04.04.113(BB).[1]  A prisoner designated as an STG II member must be housed in security level IV or higher.  STG II members are also subject to the following restrictions:  prisoners are generally limited to two non-contact visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; no participation in group leisure time activities, except for yard; cell search at least once per week; out-of-cell movement not to exceed one hour per day, excluding showers, meals, work, etc.  PD 04.04.113(CC).

The STG policy requires local STG coordinators to review each prisoner with an STG designation at least annually to determine whether the designation should be removed or modified.  If the local coordinator believes the designation should be removed or reduced, he or she can make that recommendation to the warden.  If the warden approves, the matter proceeds to the CFA STG Coordinator.  Only that coordinator can decide whether to remove or reduce the designation.

Plaintiff also sues MCF Chaplain Unknown Curtis, MCF Quartermaster Unknown Arends, MCF Librarian Unknown Hardiman, and Unknown Parties described as the members of the MCF STG Team.  Plaintiff sues each Defendant in the defendant's respective official and personal capacity.

Plaintiff alleges that, since he arrived at MCF on January 4, 2019, he "has helped and continues to help with the grievance process several prisoners who have limited understanding of policies and procedures, whose education falls below the normal expectation, or who cannot read.  Those prisoners include Teaghun Brethauer, Dondre Slater, Geoffrey Huston, Dan

---

[1] See also MDOC Director's Office Memorandum 2020-12 (Eff. 1/1/2020), available at https://www.michigan.gov/ documents/corrections/DOM_2020-12_STG_Final_675287_7.pdf.

Bozeman II. Each prisoner has provided an affidavit to support Plaintiff's complaint; however, none of the prisoners indicate that they cannot read. Instead, they report that they sought help and advice from Plaintiff (Aff. of Teaghun Brethauer, ECF No. 1-1, PageID.24; Aff. of Dondre Slater, ECF No. 1-2, PageID.27), that Plaintiff helped write grievances and gave direction (Aff. of Geoffrey Huston, ECF No. 1-3, PageID.30), and Plaintiff reviewed grievance policy and procedure because the prisoner needed help (Aff. of Dan Bozeman II, ECF No. 1-4, PageID.32).

Plaintiff claims that his work on behalf of other prisoners has prompted retaliation from Defendants—against the other prisoners and against Plaintiff. During January of 2020, Plaintiff sought to compel the annual review of his STG status. Defendant Knapp informed Plaintiff he would not review his STG designation because Plaintiff helped other prisoners write grievances. After Plaintiff complained, Defendant Knapp informed his superiors that he had reviewed Plaintiff on May 13, 2019. Plaintiff claims that is not true. Plaintiff insists that Defendant Knapp's failure to consider Plaintiff for STG review is contrary to MDOC policy.

Defendant Knapp, acting in conjunction with other Defendants, retaliated against Plaintiff in other ways as well. At the end of February, 2020, Defendant Curtis acting in concert with Knapp, informed Plaintiff he would not get a call-out for the Nation of Islam Saviour's Day program. Working through a prison counselor, plaintiff was able to get that wrongful application of policy corrected.

The next week, Plaintiff was denied a call-out to Defendant Quartermaster Unknown Arends for the purpose of getting Plaintiff's pants fixed—they had busted open at the seams in the seat. Plaintiff was forced to wear the torn pants for almost a week

The same day Plaintiff received the call-out to fix his pants, he spoke with a librarian—not Defendant Hardiman—regarding conflicts between Plaintiff's night law library

time and his night yard.  Plaintiff was told that it was an STG issue and that Defendant Hardiman handled the scheduling.  Plaintiff wrote a kite to Defendants Hardiman and Knapp so that his schedule would permit law library time during the day and night yard.  Because of his STG status, however, Plaintiff was not permitted law library time during the day, only in the evening.  As a result, Plaintiff was forced to give up either his law library time or his yard time.

Plaintiff contends these retaliatory actions violate his First Amendment rights as well as his due process rights.  Plaintiff seeks declaratory and injunctive relief compelling Defendants to remove the STG designation, to expunge it from Plaintiff's file, and to lift all restrictions attendant to the STG designation.  Additionally, Plaintiff seeks hundreds of thousands of dollars in compensatory and punitive damages.

## II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court

5

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III.  STG status

Plaintiff complains that Defendants—but in particular Defendant Knapp—has failed to follow MDOC procedure with regard to annual review of Plaintiff's STG status. Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Plaintiff's assertion that Defendants violated MDOC policy therefore fails to state a claim under § 1983.

Plaintiff also suggests that Defendants' failure to follow their own policy might rise to the level of a due process violation. The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*,

438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Plaintiff claims that due process should protect the removal or reconsideration of his STG status. That interest, however, is not protected by the due process clause.

As noted above, STG status carries with it a number of restrictive conditions of confinement. The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

7

The Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976). Prisoners cannot "have a protected liberty interest in the procedure[s] affecting [their] classification and security, because the resulting restraint, without more, [does] not impose and 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Cash v. Reno*, No. 97-5220 1997 WL 809982, at *1 (6th Cir. Dec. 23, 1997); *see also Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998); *Moore v. Sally*, No. 97-4384, 1999 WL 96725, at *1 (6th Cir. Feb. 3, 1999). Without such a protectible interest, Plaintiff cannot successfully claim he has been denied due process, because "process is not an end in itself." *Olim*, 461 U.S. at 250.

The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges. For example, in *Guile v. Ball*, 521 F. App'x 542 (6th Cir. 2013), the Sixth Circuit rejected Plaintiff Guile's claim that his designation as a homosexual predator and consequent transfer to a Level V facility with more restrictive conditions resulted in an atypical, significant deprivation. 521 F. App'x at 544; *see also O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, at *1 (6th Cir. Mar. 22, 1993) (designation as homosexual predator and assignment to Level IV facility with additional restrictions did not implicate a protected liberty interest).

Plaintiff's STG designation is, in effect, just another type of security classification. *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005). Nonetheless, because the restrictions are more severe than those that follow from being designated at the highest security level—level V— additional scrutiny of their significance and typicality is appropriate.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court took a closer look at the restrictive conditions of confinement that followed classification to the highest security—"Supermax"—prison in Ohio:

> Conditions at OSP[, the "Supermax" facility,] are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units. The latter are themselves a highly restrictive form of solitary confinement. *See Austin I, supra*, at 724-725, and n.5 (citing Ohio Admin. Code § 5120-9-13 (2001) (rescinded 2004)). In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.
>
> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.
>
> Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there. *Austin I, supra*, at 740. Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP. 189 F. Supp. 2d, at 728.

*Wilkinson*, 545 U.S. at 210-11. The Court considered, as *Sandin* directs, whether these conditions were significant and atypical compared to the ordinary incidents of prison life. The Court acknowledged the difficulty in "identifying the baseline from which to measure what is atypical and significant . . . ." *Id*. at 223. Nonetheless, the Court concluded that at least some of the restrictions imposed in Ohio's "Supermax" were atypical and significant "under any plausible baseline." *Id*. The Court declared that the specific restrictions that rendered confinement in "Supermax" atypical and significant were:

> almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours;

9

> exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. *Austin I*, 189 F. Supp. 2d, at 728. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. *Sandin*, *supra*, at 483.

*Id.* at 223-24.

Two months after the Supreme Court issued the *Wilkinson* opinion, the Sixth Circuit considered whether the restrictions that followed the STG designations (I and II) were significant and atypical under *Sandin*. *Harbin-Bey*, 420 F.3d at 576-77. The court held that they were not atypical and significant and that, therefore, the plaintiff did not have a liberty interest protected by the Fourteenth Amendment Due Process Clause and Plaintiff's complaint was properly dismissed upon initial review. *Id.*

Four years later, in *Heard v. Caruso*, 351 F. App'x 1 (6th Cir. 2009), the Sixth Circuit again considered the restrictions that followed the STG II designation. In *Heard*, however, the plaintiff had supplemented his complaint to include allegations that parroted some of the language *Wilkinson* Court used to describe Ohio's "Supermax" restrictions.[2] The court of appeals

---

[2] Prisoner Heard's supplemental allegations were as follows:

> Security Threat Group designations to status II result in plaintiff being placed in a maximum security prison, which is the most secured of all Michigan Department of Corrections prisons; but plaintiff does not challenge the increase in classification as a result of the STG designation. The challenge is to the atypical and significant hardships place[d] on plaintiff as a result of the designation that trigger due process. The designations are indefinite and paroles are automatically denied, there are only five minute showers (which include washing and drying off); visits are restricted to two one hour non-contacts visits per month; and all human contact is limited to yard, dining hall, library and religious service which culminate to a potential maximum of 21 hours out [of] the cell per week. Cell to cell communication is prohibited, the lights, though [they] may be dimmed at night, [are] on 24 hours a day. These conditions are not ordinary conditions in the life of a prisoner in lower levels (1-4) in MDOC.

10

concluded those allegations warranted factual inquiry along the lines of that conducted by the Supreme Court in *Wilkinson*.

On remand, this Court granted summary judgment in the *Heard* defendants' favor on Heard's due process claim. *Heard v. Caruso*, No. 2:05-cv-231 (W.D. Mich. Aug. 30, 2011) (ECF No. 410). The Court found that the restrictions attendant to the STG II designation did not rise to the level of the "Supermax" restrictions that the *Wilkinson* Court found warranted due process protections. Specifically, this Court found that the STG II restrictions did not extremely isolate the prisoners or disqualify them from parole. This Court concluded, therefore, that due process protection for the STG II designation was not required. (2:05-cv-231, ECF No. 410, PageID.2470.)[3]

Two of the key factors that prompted the *Wilkinson* Court to conclude that due process protected the "Supermax" classification—parole disqualification and extreme isolation— are not present here. Without those factors, the conditions of confinement for prisoners designated STG II are not significant and atypical departures from the normal incidents of prison life. The lesser restrictions of STG I, likewise, would not be significant and atypical departures either. Plaintiff has failed to identify a protected liberty interest with respect to his security level or STG classification and, consequently, he has failed to state a claim for violation of his due process rights by virtue of Defendants' actions with respect to Plaintiff's security level or STG designation.

---

*Heard*, 351 F. App'x at 8-9. Heard also suggested that the designation disqualified him from parole. *Id.* Plaintiff's allegations here do not come close to the allegations in *Wilkinson* or *Heard*.

[3] The Sixth Circuit Court of Appeals affirmed this Court's summary judgment on that claim. *Heard v. Caruso*, No. 12-1517 (6th Cir. Mar. 12, 2013) (*Heard II*). The court of appeals did not consider whether Plaintiff had a liberty interest; instead, the court reasoned that even if he did have such an interest, he received all of the process he was due. *Heard II*, at p. 6 (No. 2:05-cv-231, ECF No. 442.)

### IV. Due process right to grievance remedy

Plaintiff also appears to claim that he has been denied due process rights in connection with the administrative grievance remedy. Plaintiff has no due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

Plaintiff claims that Defendants' interference with the processing of his grievance violated Plaintiff's First Amendment right to petition the government for redress. The amendment stops the government from generally prohibiting expressions in the form of petitions for redress and from imposing sanctions on one who petitions for redress. *Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 464 (1979). In *Apple v. Glenn*, 183 F.3d 477 (6th Cir. 1999), the Sixth Circuit explained the nature of the right:

> The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). The First Amendment protects Apple's right to petition, but his suit is founded completely on a mistaken reading of that Amendment. A citizen's right to petition the government does not guarantee a response to the

12

petition or the right to compel government officials to act on or adopt a citizen's views.

*Apple*, 183 F.3d at 479; *see also BPNC, Inc. v. Taft*, 147 F. App'x 525, 531 (6th Cir. 2005) ("The purpose of the Petition Clause, though, is to ensure that citizens may communicate their will through direct petition to the legislature and government officials."). Thus, Plaintiff has a First Amendment right to file grievances against prison officials, *Herron v. Harrison*, 203 F. 3d 410,415 (6th Cir. 2000), but the amendment does not require the government to consider, respond to, or grant relief on that grievance.

Plaintiff's allegations reveal that he is trying to expand his right to petition for redress—to complain about prison officials—into a right to compel those officials to listen, or at least to follow their own procedures. The protections afforded by the right to petition are not that broad. It is a right of expression, not a right to process following the expression. "[A] state has no federal due process obligation to follow all of its own grievance procedures . . . ." *Carlton v. Jondreau*, 76 F. App's 642, 644 (6th Cir. 2003). An inmate does not have a constitutionally protected interest in a jail or prison grievance procedure or the right to an effective procedure. *Walker v. Michigan Dep't of Corrections*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003). Section 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

**V.     First Amendment retaliation**

Although Plaintiff does not have a First Amendment right to compel the government to listen and respond to his grievances, he does have a right to file grievances without retaliation. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order

13

to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff's retaliation claims fails at the first step. The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith*, 250 F.3d at 1037; *Herron*, 203 F.3d at 415. But, a prisoner does not have an independent right to help others with their legal claims and grievances, unless the inmate the receiving the assistance would otherwise be unable to seek redress. *Herron*, 230 F.3d at 415-16 (citing *Thaddeus-X*, 175 F.3d at 395) (holding that while a prisoner does not have an independent right to help others with their legal claims and grievances, such conduct is protected when the inmate receiving the assistance would otherwise be unable to seek redress). Plaintiff's allegations indicate that the other prisoners were certainly benefitted by Plaintiff's assistance, but the allegations fall short of showing that the prisoners would have been unable to seek redress in the absence of Plaintiff's assistance. Not even the prisoners' affidavits suggest that Plaintiff's assistance was ***required***.

If Plaintiff would choose instead to rely on his own grievances as protected conduct, his allegations fall short at the third step. There are no allegations that suggest that Defendants' conduct was motivated by Plaintiff's grievances. Indeed, Plaintiff clearly attributes the retaliatory

conduct to Defendants' dissatisfaction with Plaintiff's work on behalf of other prisoners. Accordingly, Plaintiff has failed to state a claim for First Amendment retaliation.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated:   September 3, 2020              /s/ Janet T. Neff
                                        Janet T. Neff
                                        United States District Judge